652 S.E.2d 73

**John J. McCROSSON, Appellant,**

**v.**

**Kimberly Paige TANENBAUM, Respondent.**

**No. 4276.**

Court of Appeals of South Carolina.

Heard Feb. 7, 2007.

Decided July 13, 2007.

Rehearing Denied Sept. 25, 2007.

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

Donald Bruce Clark, of Charleston, and Mark O. Andrews, of Mt. Pleasant, for Appellant.

Desa Ballard, of W. Columbia, John S. Nichols, of Columbia, and Susan T. Kinard, of Mt. Pleasant, for Respondent.

HEARN, C.J.:

John J. McCrosson (Husband) appeals an order of the family court granting Kimberly Paige Tanenbaum (Wife) custody of the parties' two children, ordering Husband to pay $5,500 per month in child support and $100,000 for Wife's

attorney's fees, and dividing the marital property in such a way that Wife receives ninety percent of the estate. We affirm in part and reverse in part.

## FACTS

Husband and Wife have known each other since they were young children, having attended the same elementary school while growing up in Aiken, South Carolina. The parties lost touch after high school, but rekindled their friendship when both were living in Charleston. Wife, who has a master's degree in education, was teaching elementary school, and Husband, who is now an orthopedic surgeon, was finishing his education at the Medical University of South Carolina.

After dating for approximately eighteen months, the parties married on April 8, 1995. Although Wife initially informed the family court in an affidavit submitted at the temporary hearing that the parties had a "healthy and normal sexual relationship," all the evidence at trial, including Wife's testimony, contradicts that initial statement. In fact, the parties' sexual incompatibility plagued the couple throughout the marriage.

During the first year of marriage, Wife taught elementary school while Husband was a medical resident. Wife became pregnant that year and quit her job during the summer of 1996 so that she could be a stay-at-home mother for Matthew, who was born on August 12, 1996.

In 1999, the parties moved to New York so Husband could complete his residency in orthopedics. While in New York, Wife met a man named Max while at Barnes & Noble with Matthew, who was three years old at the time. Wife befriended Max, and ultimately the two had a sexual affair. Wife admitted that she would either leave Matthew with a babysitter or with Husband while she secretly met with Max. Husband suspected the affair, especially after he found incriminating emails between Wife and Max. Husband confronted Wife about his suspicions, and Wife denied having sex with Max but admitted having an "emotional affair." A serious argument between Husband and Wife ensued, and Wife not only threatened to leave the marriage but actually packed her bags. Both parties agree the argument ended with Husband apolo-

gizing profusely and asking that they "start over" and try to make the marriage work.

In October of 2000, Wife again told Husband she did not want to be married. The couple went to counseling for the first time, in an effort to salvage their marriage. Two months later, Wife gave birth to the parties' second child, Anna Madden. Despite this happy event, Husband and Wife's marriage continued to deteriorate.

By this time, Husband's income had increased significantly. In February 2001, the parties hired Annie Carter to help clean the home and Valerie Turner to help watch the children. Valerie quit around December of 2002, and Annie began working two days a week, spending half of her time cleaning and half of her time caring for the children.[1] Annie testified that, at one point, she suspected Wife was having an affair because she spent so much time away from home. Annie also noted that Wife was more reserved with Anna Madden and "never even played with her." As between the two parties, Annie believed Husband was the more nurturing parent.

In January 2002, the parties purchased a second home in McClellanville, which was on deep water (the Shellmore residence). After moving into the home, Wife's HIV-positive cousin,[2] Matthew Madden, was released from prison after serving nine years for murder. Wife wanted her cousin to move into the parties' home so that he could have a fresh start. Annie Carter was relieved from her duties because Matthew Madden was going to take care of the home. Husband testified that he was apprehensive about the arrangement, but he acquiesced in an effort to make Wife happy. However, Husband insisted Matthew Madden leave the home when Husband learned Wife was leaving the children unsupervised in his care.

---

1. At one point, Wife claimed Annie was not a nanny. Later, however, Wife testified that Annie was not a good housekeeper but was a great child care provider. Wife also testified at one point that Annie was not terminated, but she quit, and at another point she said she was terminated.

2. We note this fact because it was one of several reasons Husband was wary of Matthew Madden being used as the children's caretaker.

In July of 2002, the parties continued to try to salvage their relationship by attending marriage counseling with Alice Timmons. When the issue of Husband's lingering suspicions of Wife's infidelity came up, Wife continued to deny ever having an affair.

In August of 2002, Valerie Turner returned to the parties' home and worked twenty hours a week. The parties left their children in Valerie's care while they were out of town for the weekend. When the parties returned, they learned that someone had stolen their checkbook and attempted to negotiate those stolen checks. The perpetrator was a gentleman Valerie had invited to the parties' home while she was caring for the children. The parties also found an empty condom wrapper stuffed behind a cushion of the couch in the children's playroom. Wife contacted Valerie, who admitted having the man over to the house, but denied having sex with him. After hearing Valerie's apology, as well as her explanation that the condom wrapper had simply fallen out of her purse, Wife wanted to give Valerie a second chance and continue using her as the children's nanny. Husband, however, demanded Valerie be fired, which ultimately happened.

After Valerie was fired, Wife received a phone call from a woman who was considering hiring Valerie as a nanny. Wife lied about the reason Valerie had been fired, explaining instead that Valerie was let go simply because the parties were going through a divorce and Wife could no longer afford a nanny.

During the parties' marriage, Husband was not only concerned about Wife's past infidelity, but he also grew suspicious of Wife's relationship with a female friend, Adrienne. Husband confronted Wife about his suspicions, which ultimately resulted in the parties' separation.

During the separation, the parties attempted to reconcile and pursued counseling, this time with Acton Beard. During these counseling sessions, Wife again denied ever being unfaithful to Husband. At trial, Wife admitted she had been untruthful when she denied the affair, but that Max "was never an issue in [the] marriage after [she promised to stop seeing him] ... even in marriage counseling, it wasn't like it was concentrated on." She explained that she was too terri-

fied to admit the affair to counselors for fear it would ruin the marriage.

In February of 2003, Husband met with Ken and Mary Ann Caldwell. Ken was a partner in Husband's orthopedics practice, and Ken and Mary had previously been the parties' Sunday school teachers. The Caldwells convinced Husband that Wife's behavior could be forgiven, and Husband called Wife to discuss the possibility of reconciling. The parties talked on the phone over the course of several days and eventually they went to church together. They spent the day at the Shellmore residence with the children, and they both spoke openly about the problems in the marriage. Husband explained that he did not like Wife's relationship with Adrienne, even if nothing sexual was occurring between them. Wife assured Husband that she and Adrienne were not sleeping together, but Wife finally confessed to her affair with Max. After this admission and a long conversation, Husband and Wife had sex.[3]

The parties' reconciliation was short-lived. Husband testified that after their reconciliation weekend, Wife told all of her friends and family that she and Husband had sex and he had forgiven her. However, when Husband tried to see Wife again, she declined to see him. The following weekend Husband took the children to Virginia for a previously planned ski trip. On the drive home, he called Wife and left a message on her voicemail. When she returned the call, the caller I.D. was blocked. Wife said she was in the car with her sister. More phone calls with a blocked I.D. followed, and Husband inquired why that was happening. Wife eventually admitted that she was actually at home with Adrienne.[4] Shortly upon his return to South Carolina, Husband filed for divorce.

---

3. Husband testified that after the parties had disrobed and he was about to engage in intercourse with Wife, she giggled and said, "I guess this takes care of Max." Wife denies this.

4. Wife admits she lied to Husband about being out with her sister, but claims she told Husband this because she was upset that he had not informed his mother of the parties' reconciliation. Because she was upset with Husband, Wife did not want him to come to her house. According to Wife, Adrienne's presence in the home was coincidental, as she had merely stopped by to look at some exercise equipment Wife was selling.

At a temporary hearing, the parties were awarded true joint custody of their children. Husband had the children from Thursday afternoon to Monday morning, and Wife had the children for the remainder of the week.[5] Summers were split equally between the parties, and Husband was ordered to pay $2,000 per month in child support, in addition to paying the mortgage, utilities, and phone services for both marital homes. Husband was also ordered to pay for the children's educational expenses.

During the eighteen months that elapsed between the complaint being filed and the final hearing, Wife had two more confirmed affairs. However, she never withdrew her request for alimony. One affair was a "one-night stand" with "Rhett," a man she met at the beach. The other was a longer term relationship with a man named Darren Kerr. At her deposition, Wife denied the affair with Rhett, but she admitted it at trial. She explained that she was afraid to tell the truth about Rhett because it might cause her to lose custody of the children. As for Darren Kerr, the family court found Wife in contempt of court for going to the Christmas parade with Darren and her daughter, Anna Madden. The family court also found Wife in contempt of court for violating a consent order which prohibited her from exposing the children to an alcoholic friend of Wife's who had recently been arrested for driving her car into her boyfriend's house.[6]

The final hearing was a lengthy, twelve-day trial that was heard piece-meal over an eight month period. Numerous witnesses testified on behalf of both parties. Husband's witnesses portrayed him as an involved and loving father who was committed to putting his children before work. Wife's witnesses portrayed her as a model mother who took an active role in her children's school and church life.

---

5. Wife complained about this arrangement because Husband had the children over the weekend and she had the children during the school week. She said that she had to beg Husband for extra time with the children and complained that she never had a weekend with the children after the temporary order was issued. When confronted with calendars on cross examination, Wife admitted Husband had allowed her numerous weekends with the children.

6. Wife was also held in contempt for failing to pay Husband's attorney for fees related to a motion to compel.

Although Husband acknowledges that Wife was the primary caretaker of Matthew during his early years, Husband testified that Wife's attitude towards motherhood and her capabilities as a parent changed remarkably when the parties moved to New York. According to Husband, after Anna Madden was born, Wife suffered from post-partum depression and never seemed to bond with their daughter. Husband also asserts that Wife used daycare excessively in order to pursue her own private life. Husband explained that he was at a point in his career where he had the luxury of setting his own hours and that he could easily arrange his schedule around the children's needs.

Wife claims that she has always been the primary caretaker of the children, and unlike Husband, whose number one priority is work, her life has revolved around the children. Wife also claims that the great majority of the time she spent out of the home was for child-centered activities, such as being Matthew's room mother and chairing the school's Halloween carnival.

The guardian ad litem, Stephen Dey, filed a lengthy and thorough report. In the report, the guardian explained that he first believed that Husband's claims about Wife were farfetched and that he found Wife to be charming and sincere. However, after spending more time with both parties, he learned Wife tended to answer questions untruthfully. She admitted to lying about her affair with Max and lying about going out with her sister when in fact Adrienne was at the house. She also admitted that she lied to another parent regarding the circumstances of Valerie Turner's termination.

The guardian also expressed concern over Wife's ability to parent based on her handling of an incident during the parties' separation. While the children were in Wife's custody, Wife took the dog outside one evening, and Anna Madden, who was not quite three years old, climbed out of her crib and walked out of the house. Wife soon realized Anna Madden was missing and called the police. Anna Madden was found within fifteen minutes at a neighbor's house. Wife never told Husband about their daughter's "escape" even though Husband lived on deep water. The guardian explained that he was not so concerned about Anna Madden being lost, as scary things

like that can happen to the best of parents, but was more worried by Wife's failure to reveal the incident to Husband because she did not want it to hurt her custody case.

The guardian also noted that even though Wife reported being "heartbroken" when the children were in Husband's care, she had Anna Madden in full-time, five days per week daycare even after joint custody was ordered. When the guardian asked Wife about this, she said she did it because that is what the temporary order required. The temporary order does not contain any directive requiring full-time day-care.

The guardian expressed concern that Wife made the parties' son, Matthew, feel uncomfortable because she would interrogate him about what had transpired while the children were in Husband's care. The guardian and the children's therapist, Karen Tarpey, spoke to both parties about protecting the children from such inquiries.

After the guardian filed his initial report, one of Wife's best friends, Michelle Crossland, contacted the people the guardian had interviewed and asked them if they wanted to correct anything the guardian reported. Ms. Crossland personally delivered a letter to Annie Carter, the parties' former nanny and housekeeper, who provided some of the most unfavorable information regarding Wife. The letter was hand-delivered while Annie was working at a home of Ms. Crossland's friend. Despite receiving this letter, Annie testified that the guardian had accurately summarized her views.

At trial, Wife accused the guardian of being biased. She alleged that he told her she should settle the case in favor of Husband because no sitting judge would rule against Husband's attorney, whose wife is a family court judge.[7] Wife also claims the guardian told her the case would likely be heard by one of two Berkeley County judges, "both of whom are reputed to be unlikely to award custody to a litigant if any adultery or other morality issues are raised." The guardian's version of what he told Wife is much different. According to him, he met with both parties, with the blessing of their

---

7. At trial, Mark Andrews represented Husband. Mr. Andrews is married to Judge Frances Segars–Andrews, a family court judge in Charleston.

attorneys, after mediation failed. Apparently, there was miscommunication regarding Husband's settlement offer, and both attorneys agreed the guardian would be in the best position to clear up that miscommunication. The guardian claims he spoke with both parties separately prior to trial. During that communication, he explained where they were in the litigation process. He told them that if they went to trial it would most likely be in front of an out of county judge because Husband's attorney is married to a Charleston County judge. The guardian admitted that he told the parties theirs was not the kind of case he would want to bring in front of a judge. He also talked with the parties about the concept of "fair." He explained that what is fair to one may be unfair to the other and that if either wanted fair, he or she would have to "go out to Ladsen because they have a fair in October." The guardian apologized for making this flippant remark, but again stressed that he was trying to persuade the parties to consider mediation, as both parties' attorneys urged him to.

Notably, at trial, Wife blamed the guardian's bias as the reason she did not inform Husband of Anna Madden's escape. However, Anna Madden was lost in October of 2003, and the guardian did not have the above conversation with Wife, to which she attributes his bias, until December of 2003.[8]

After the trial, the family court granted primary custody to Wife and ordered Husband to pay $5,500 per month in child support. In the order, the family court noted "concern" regarding statements Wife alleged the guardian had made and the family court found "these statements tend to impune [sic] both the Judiciary and the entire Judicial System." For that reason, it appears the family court judge gave little if any weight to the guardian's report. In addition to granting Wife primary custody, the family court ordered the marital property be divided fifty-fifty[9] between the parties and ordered

---

**8.** Incidentally, the guardian did not find out about Anna Madden being lost until Husband mentioned it in February of 2004. Husband explained he had not said anything before because he did not want it to have a chilling effect on Wife's decision to report incidents like that in the future.

**9.** Husband contends that even though the family court ordered a fifty-fifty division, the way in which the marital estate was divided resulted

Husband to pay $100,000 towards Wife's attorney's fees. This appeal followed.[10]

## STANDARD OF REVIEW

In appeals from the family court, the appellate court has the authority to find facts in accordance with its own view of the preponderance of the evidence. *Wooten v. Wooten*, 364 S.C. 532, 615 S.E.2d 98 (2005). In spite of this broad scope of review, we remain mindful that the family court judge saw and heard the witnesses and generally is in a better position to determine credibility. *Id.*

## LAW/ANALYSIS

### I. Child Custody

Husband first argues the family court erred in awarding Wife primary custody of the children. We agree.

Initially, we note that the family court had favorable findings with regard to each party's parenting ability. As to Wife, the court found:

> Since Matthew's birth, [Wife] has not worked outside of the home and seemed to devote significant time and energy to matters related to the children's activities. She has been very engaged in the children's school activities, being a room mother and also volunteering and participating in a variety of activities and events at the children's schools. This has continued to be true during the pendency of this action. This Court is satisfied that the children are happy and well cared for when in [Wife's] care and know how much she loves them.

Likewise, the family court commended Husband as a parent:

> [Husband] is also a dedicated and loving parent. While [Husband's] time with Matthew was somewhat limited dur-

---

in Wife receiving ninety percent of the assets. These issues regarding valuation are addressed below.

10. Our court superseded the family court's final order upon Husband's petition. We reinstated the joint custody arrangement established in the temporary order, reduced Husband's child support to $2,000 per month, and ordered the appeal be expedited.

ing the first two years after Matthew's birth due to the demands of the Husband's residency program, I find that [Husband] was a "hands on" parent even during those early years and has become ever increasingly involved in all aspects of the children's lives. Credible testimony was provided by neighbors, Matthew's soccer coach and others who testified as to their observations of [Husband's] healthy, instructive, and nurturing relationship and interactions with the children. The children are clearly happy and well cared for while in [Husband's] care.

 South Carolina law is clear that when considering child custody, neither parent has any right paramount to the right of the other. S.C.Code Ann. § 21–21–10. The tender years doctrine, a legal principle favoring mothers over fathers in custody disputes, was abolished by statute over a decade ago. S.C.Code Ann. § 20–7–1525 (Supp.2005). When making a determination regarding custody, a parent's gender is of no significance. *Kisling v. Allison*, 343 S.C. 674, 678, 541 S.E.2d 273, 275 (Ct.App.2001). Rather, the best interests of the children are the paramount and controlling consideration in all custody controversies. *Woodall v. Woodall*, 322 S.C. 7, 11, 471 S.E.2d 154, 157 (1996). To determine what is in the children's best interests, courts should consider the "character, fitness, attitude and inclination on the part of each parent as they impact on the child." *Parris v. Parris*, 319 S.C. 308, 310, 460 S.E.2d 571, 572 (1995). Additionally, courts should consider how the custody decision will impact all areas of the child's life, including "psychological, spiritual, educational, familial, emotional, and recreational aspects." *Id.*

In awarding Wife primary custody, the family court concluded:

[Wife] has been the children's primary caretaker for the majority of their lives.... [Wife] has demonstrated parenting skills superior to those of [Husband] and even though Husband states that he will be devoting less time to his career and more time to the family, his career is such that he will be busy and by necessity will be away from the children at odd hours. Husband is career centered while Wife is child centered. [Wife] has shown that she is well suited to meet the children's needs, paying consideration to the ages of the children, and Husband has shown an inabili-

ty to trust.... Wife has demonstrated Christian values of forgiveness, repentance, and tolerance while Husband has failed to demonstrate those same attributes as they pertain to his Wife. Finally, I find that [Wife] is most likely to encourage a healthy ongoing relationship between the children and [Husband]. Husband still maintains that Wife is wicked and immoral, continues to maintain that Wife is a lesbian and continues to hang on to hate and anger, refusing to take responsibility for his part of the break down in the marital relationship.

After an exhaustive review of the record, we find no support for the majority of these findings by the family court. Although Wife did not work outside the home and may have been the children's primary caretaker when they were infants, there was ample evidence that her role in the children's lives diminished as they grew older. Both children began attending daycare when they were two years old, and prior to the parties' separation, they had hired a nanny to work in their home twenty hours a week. Wife admitted that she used a babysitter on at least one occasion so that she could meet with Max, and Annie Carter, who had worked in the parties' home for fifteen months, observed that Wife spent a significant amount of time away from the home. Even during the pendency of the litigation, when Wife only had the children three nights a week, she continued to have Anna Madden in full-time, five-days-a-week preschool. When asked by the guardian why she chose full-time preschool, Wife contended that the temporary order required it; however, there was no such requirement in the order. Furthermore, at the time of the final hearing, the parties had been operating under a joint custody arrangement for eighteen months, so the amount of time each party spent with the children had equalized.

The record also does not support the family court's finding that Husband's career will require him to work at odd hours. Husband's testimony, as well as the testimony from his medical assistant, indicated that Husband would be able to perform surgeries while the children were in school. In fact, during the period of time when the parties operated under the temporary order, Husband often took Fridays off so that he could be with Anna Madden during the day rather than sending her to preschool.

As for the family court's admiration of Wife's "Christian value of repentance," we are not as impressed. Wife denied her affair with Max for several years, and she did not admit to sleeping with Rhett until she was on the stand, after having already perjured herself on the subject. Furthermore, adultery was a major issue in the case because Wife never withdrew her request for alimony. Under such circumstances, we are sympathetic to Husband's struggle to forgive.[11] While we do believe it is important for divorced parents to foster, not sabotage, their children's relationship with the other parent, there is no indication that Husband's inability to forgive Wife's affairs hindered the children's relationship with Wife. To the contrary, the guardian reported that it was Wife who made the parties' son feel uncomfortable because she would interrogate him about what had transpired while the children were in Husband's care. At trial, Husband testified he would "do everything within [his] power to foster a loving relationship between [Wife] and the children for the rest of [his] life."

Finally, we disagree with the finding that Husband did not take responsibility for his part in the marital break-up. After the parties argued about Wife's relationship with Max while they still lived in New York, it was Wife who packed her bags and was ready to leave the relationship and Husband who begged forgiveness and asked her to stay. Furthermore, it was Husband who contacted Wife in February of 2003 and initiated the brief period of reconciliation between the parties. Even during the trial, Husband testified that he was "[g]rave-

---

11. The parties' Christian religion was a major theme throughout the trial. The family court's finding regarding Husband's inability to forgive seems largely based on an entry from Husband's prayer journal, which was given to Wife in discovery. According to the family court order, Husband's journal "indicates that his desire is to see to it that Wife be broken and humbled and pray that the evil does not prevail against him." While this excerpt may seem harsh when read in isolation, the entire entry actually reflects a writer who is desperately hopeful that his marriage might be saved. The entry reads:

Today is the meeting with [Acton] Beard. I pray that I am obedient to God's will in the meeting. Spirit of love and peace preside. Wisdom for [Acton] Beard, myself, and Paige. Paige be broken, humble, honest. Paige see I want to help her, not hurt her. Let me receive instruction and rebuke if appropriate. God be glorified! Children's interests a priority.

ly sorry if there [was] something that [he] could have done better."

"In determining the best interest of the child[ren], the court undertakes the awesome task of looking into the past and predicting which of the two available environments will advance the best interest of the child and bring about the best adjusted mature individual." *Cook v. Cobb*, 271 S.C. 136, 142, 245 S.E.2d 612, 615 (1978). Looking at the parties' past behavior, we have serious concerns regarding Wife's judgment as a parent and her ability to raise well-adjusted, mature children.

The family court listed a number of examples where each party showed poor judgment in "child related subjects and circumstances." Mother's list included such alarming behavior as failing to notify Father that the parties' daughter had "escaped" from her crib, ventured outside, and had been lost for approximately fifteen minutes one evening; violating the temporary order's prohibition against having the children around a paramour; violating a consent order prohibiting her from having the children around an alcoholic friend of hers who was facing criminal charges; and hiring her cousin, a convicted murderer who was HIV positive, as the children's nanny. Mother also wanted to give a "second chance" to Valerie Turner even though compelling evidence suggested Valerie had sexual relations in the children's playroom with a man who stole and later tried to negotiate blank checks he acquired while in the parties' home. When another parent called seeking a reference for Valerie, Mother was dishonest about the circumstances under which Valerie was fired and provided a positive recommendation, thus putting an innocent child at risk.

Husband's list of "poor judgment" contained much less serious mishaps. While in Husband's care, the parties' son received a cut while playing with a PVC pipe with his friend, and on another occasion, the son cut his feet on oyster shells while walking barefoot at Husband's home. The son also was bruised when he was hit near the eye with a paintball while Husband's medical assistant was watching the children. The

parties' daughter received burns to her fingertips when she accompanied Father to a hunt club and placed her hand on either a furnace or fire barrel; she also extensively cut her own hair when left unattended while in Father's care. Husband's list revolves more around every day accidents that happen to most children while growing up than it does poor parental decision-making skills.

In addition to Wife's poor judgment with regard to child related issues, we are deeply troubled by the number of times Wife was caught lying during the litigation. The family court listed seven instances that reflected negatively upon Wife's credibility: (1) the perjury she committed when she lied about her affair with Rhett during a deposition; (2) her being in contempt of court three times,[12] two of which involved instances where she exposed the children to people she was ordered not to; (3) her complaint during direct examination that she never had a weekend with the children since the issuance of the temporary order; (4) the statement from her initial affidavit wherein she claimed to have a "healthy and normal sexual relationship" with Husband; (5) her dishonesty, even to her own therapist, about her relationship with Max; (6) her testimony that she continually tried to reconcile with Husband up until March 2004, when in fact, she had two admitted adulterous affairs during that time; and (7) her lying about the circumstances of Valerie's termination when she was called as a reference.

After listing Wife's credibility problems, the family court went on to list twelve instances in which it found Husband was not credible: (1) his allegation that Wife traveled extensively, when evidence revealed she had only been alone on vacation for twelve days during the marriage; (2) his claim that Wife suffered from sex addiction, which the family court found was untrue; (3) his allegation that Wife had a lesbian relationship with Adrienne; (4) his accusation that Wife was in and out of counseling for many years and on antidepressants, which the

---

12. Since the final order, Wife has again been held in contempt of court for refusing to sign papers so that Husband could sell the Shellmore residence. Thus, Wife has been held in contempt on four occasions during this litigation.

family court found was misleading; (5) his statement that Wife had no concerns about leaving the children in daycare so that she could travel; (6) his denial of knowing how Wife obtained a sex toy; (7) his statement that Wife told him about several sexual encounters with girls when she was a teenager; (8) his allegation that Wife drank excessively; (9) his accusation that Wife has psychiatric problems based on physical violence, atypical sexual behavior, depression, and significant alcohol consumption; (10) his claim that Wife did not like to do housework or to cook; (11) his suggestion that Wife may have been molested as a child; and (12) his allegation that Wife had slapped the children in anger.

We find that although Husband's list is longer, very few items, if any, actually impact Husband's credibility.[13] Many of the examples on the list surround his belief that Wife had sexually deviant tendencies, which the family court found were not true. While Husband may be incorrect in his conclusions about Wife, it is unfair for his credibility to be impugned simply because he harbors these suspicions, especially in light of Wife's history of being untruthful and having extra-marital affairs.

While the family court is generally in the better position to determine a party's credibility, where there are numerous confirmed instances of a party's dishonesty, as there are here, we believe a reviewing court may have the advantage because it can consider the facts of a case without being distracted by an emotionally charged trial. After thoroughly reviewing this 3,000–plus page record, the bulk of which revealed a web of deceit woven by Wife, the family court's order awarding Wife primary custody came, quite frankly, as a surprise twist

---

13. Each accusation made by Husband has some support in the record, and in his appeal, Husband argues these findings regarding his credibility were incorrect. Because it is obvious from the lists themselves that the examples regarding Husband's lack of integrity were based upon the family court's determination that Husband failed to prove certain allegations against Wife and not based on proven lies told by Husband, we decline to go through each finding Husband disputes. Rather, we acknowledge none of the examples listed revealed any admitted lies told by Husband, whereas Wife's list contained numerous conclusively proven instances of her dishonesty.

ending. To reach such a conclusion, the family court not only adopted Wife's version of events as opposed to Husband's, but also relied on her word over that of witnesses with nothing to gain from the court's decision. For instance, the family court completely discredited the guardian's testimony simply based on Wife's allegations that the guardian was biased, even though Wife had already perjured herself for the admitted purpose of strengthening her case for custody. The guardian, on the other hand, had no vested interest in the case other than protecting the children's best interests. He has been a family court practitioner for thirty years, and the record revealed no history of him being untruthful. Moreover, Wife never moved to have the guardian removed from the case because of his alleged bias.

Based on the concerns addressed above regarding Wife's parental judgment and lack of credibility coupled with the well-supported and unappealed findings of the family court regarding Husband's ability to care for the children, we reverse the family court's decision awarding Wife primary custody. We adopt the visitation plan set forth in the family court's final order, except that Husband is the primary custodian, and Wife receives the visitation schedule originally given to Husband.

## II. Child Support

Husband next argues the family court's award of $5,500 per month in child support was excessive. Because we reverse the custody arrangement and Husband does not seek any child support from Wife in this action, we need neither address the excessiveness of the support ordered nor remand this issue for recalculation.

## III. Equitable Distribution

█ Husband also argues the family court erred in effectuating the fifty-fifty division of marital property. Specifically, Husband argues the value of the Shellmore residence, which he received in the division, should have been reduced by a six percent real estate commission because the family court knew

this asset was being sold. Husband also argues the family court overvalued the parties' boat by $6,000. We find these issues regarding valuation are not preserved for review because Husband failed to file a Rule 59(e) motion addressing these issues. *See Doe v. Doe,* 370 S.C. 206, 212, 634 S.E.2d 51, 54–55 (Ct.App.2006) (holding that the wife's argument regarding the family court's valuation of marital property was not preserved for appellate review because she failed to point out the alleged error to the family court in her Rule 59(e) motion).

## IV. Attorney's Fees

█ Finally, Husband argues that if we reverse the custody determination, we should also reverse the award of $100,000 in attorney's fees to Wife. We agree.

█ In determining whether to award attorney's fees, the family court should consider four factors: (1) the party's ability to pay his or her own attorney's fee; (2) the beneficial results obtained by the attorney; (3) the parties' respective financial conditions; and (4) the effect of the attorney's fee on each party's standard of living. *E.D.M. v. T.A.M.,* 307 S.C. 471, 415 S.E.2d 812 (1992). When the family court finds an award of attorney's fees is justified, the amount of fees should be determined by considering: (1) the nature, extent, and difficulty of the services rendered; (2) the time necessarily devoted to the case; (3) counsel's professional standing; (4) the contingency of compensation; (5) the beneficial results obtained; and (6) the customary legal fees for similar services. *Glasscock v. Glasscock,* 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991); *Deidun v. Deidun,* 362 S.C. 47, 65, 606 S.E.2d 489, 499 (Ct.App.2004). When a party's beneficial results are reversed on appeal, the attorney's fee award must also be reconsidered. *See Rogers v. Rogers,* 343 S.C. 329, 334, 540 S.E.2d 840, 842 (2001).

We recognize that even though our opinion erases Wife's beneficial results, the other three *E.D.M.* factors for awarding attorney's fees weigh in Wife's favor due to Husband's superior financial position. However, in attempting to determine the amount of fees to award based on the factors set forth in

*Glasscock,* we come to the inescapable conclusion that no amount of attorney's fees is warranted.

In her brief, Wife admits the "overwhelming amount of time at trial was devoted to the issue of child custody." Wife did not receive beneficial results with regard to this issue, especially considering Husband's offer of settlement, in which he agreed to share equal time with the children, pay $2,000 per month in child support, and pay rehabilitative alimony.[14] We note that all of the attorney's fees for which Wife requested reimbursement were incurred after Wife's rejection of Husband's settlement offer. Furthermore, the other factors to be considered, such as the time devoted to the case and the difficulty of the case, were exacerbated by Wife's refusal to withdraw her request for alimony despite her three extramarital affairs.

Based on these considerations, we find Wife is not entitled to any award of attorney's fees. Accordingly, we reverse that portion of the family court's order.

## CONCLUSION

Based on the foregoing, we find Husband is better suited to have primary custody of the parties' two children. We therefore reverse the family court's order with regard to custody and child support. We further find Wife is not entitled to attorney's fees because she no longer received beneficial results and much of the litigation expenses are attributable to her own actions. Finally, we find Husband's arguments regarding the valuation of marital property are not preserved for our review. Accordingly, the order of the family court is

**AFFIRMED IN PART and REVERSED IN PART.**

BEATTY and WILLIAMS, JJ., concur.

---

14. The parties stipulated that Husband's letter of settlement was only relevant to the issue of attorney's fees and would be viewed by the family court only after it had ruled on all other issues.